**Electronically Filed
Intermediate Court of Appeals
29998
17-FEB-2012
08:12 AM**

NO. 29998

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee,
v.
KEVIN ANTHONY, Defendant-Appellant.


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 07-1-2349)


MEMORANDUM OPINION
(By: Nakamura, C.J., and Fujise and Reifurth, JJ.)


Plaintiff-Appellee State of Hawai'i (State) charged Defendant-Appellant Kevin Anthony (Anthony) by indictment with first-degree criminal property damage (Count 1); first-degree unauthorized entry into a motor vehicle (Count 2); unauthorized control of a propelled vehicle (Count 3); unauthorized possession of confidential personal information (Count 4); second-degree theft (Count 5); first-degree assault against a law enforcement officer (Count 6); and first-degree terroristic threatening (Count 7). A jury found Anthony guilty as charged on all counts.

The Circuit Court of the First Circuit (Circuit Court)[1] sentenced Anthony to ten years of imprisonment on Count 1 and five years of imprisonment on Counts 2 through 7. The Circuit Court ran the terms of imprisonment on Counts 2 through 7 concurrent with each other but consecutive to the term of imprisonment on Count 1. Anthony appeals from the Judgment of

---

[1] The Honorable Richard K. Perkins presided.

Conviction and Sentence (Judgment) filed by the Circuit Court on July 15, 2009.

On appeal, Anthony argues: (1) the Circuit Court committed plain error in instructing the jury on the elements of first-degree criminal property damage; (2) the Circuit Court committed plain error in failing to give the jury a specific unanimity instruction as to Counts 1, 5, and 7; and (3) the Circuit Court erred in admitting the testimony of two witnesses that their property, which had been taken in uncharged thefts, was later found in the stolen car that Anthony was driving. We affirm.

BACKGROUND

I.

Harry Goldstein (Goldstein) was provided with a company-owned gold Toyota Tacoma truck to drive. On November 1, 2007, Goldstein drove the Toyota Tacoma truck home and locked the truck. Sometime during that evening, the truck was stolen, and Goldstein reported the theft to the police. According to Goldstein, the Toyota Tacoma truck was in "great shape" when it was stolen -- the door locks were not damaged and the interior was clean. Goldstein did not know Anthony and did not give Anthony permission to operate the Toyota Tacoma truck.

On December 11, 2007, Samuel Hutcheson, II (Samuel), and his wife, Que-Doan Hutcheson (Que-Doan), were visiting O'ahu on vacation and rented a white Chevy Trailblazer. That morning, the Hutchesons drove the Trailblazer to Kualoa Beach Park, arriving between 11:00 and 11:30, and parked the car facing the beach. They left various personal belongings in the car, including a Louis Vuitton purse, a red bag, a duffle bag, other bags, a GPS system, a PalmPilot, two cellular telephones, identification, credit cards, and other items. Samuel placed these belongings "underneath the back passenger seat," covered them with towels, and locked the car before he and Que-Doan walked to the beach to take pictures.

2

As the Hutchesons returned from the beach, Samuel from a distance saw a gold Toyota Tacoma truck parked right next to his rental car, but facing in the opposite direction so that the driver's door of each vehicle was next to each other.  The doors of both vehicles were open, and Samuel saw a man throwing items from his Trailblazer into the Toyota Tacoma truck.  Samuel started running towards the two vehicles and yelled at the man. The man got in the truck, "pealed out" of the parking lot, and left the park.  Samuel only saw one man in the Toyota Tacoma truck.  Samuel did not see the Toyota Tacoma truck stop and pick up anyone on the way out of the park.

Samuel "flagged someone down" and used that person's cell phone to call 911.  He provided a description of the vehicle that had driven away as a "gold Toyota Tacoma" and its license plate number to the 911 operator.  Samuel also provided a description of the suspect to the 911 operator and later to police detectives as a Caucasian male, about 6' 1" tall and weighing about 185 pounds, who was not clean shaven and "maybe" had a goatee that was "dark brownish" in color.  The following day, Samuel was shown a photographic lineup and selected a photograph of someone other than Anthony.  Samuel was not asked to identify Anthony at trial.  Que-Doan did not see the person who was in their rental car.

At about 11:57 a.m., Honolulu Police Department (HPD) Officers Quentin Apilando (Officer Apilando) and Dayle Morita (Officer Morita) received a call from HPD dispatch.  The call reported that a vehicle had just been broken into at Kualoa Beach Park and that the suspect, driving a gold Toyota Tacoma truck, had fled the scene.  When the officers received the call, they were on duty, in plain clothes, in an unmarked Toyota 4Runner. The officers were in the area of "Kam Highway and Haiku Road," which was a little over seven miles and a fifteen minute drive from Kualoa Beach Park.  Officer Morita was driving.  The officers got onto Kahekili Highway headed northbound in an attempt to intercept the fleeing suspect.  When they "got to the

3

area of Ahuimanu Road," they spotted a gold Toyota Tacoma truck traveling in the opposite direction. After the Toyota Tacoma truck passed them, Officer Morita made a U-turn and began traveling southbound about four cars behind the Toyota Tacoma truck. Officer Apilando informed dispatch that they had possibly observed the suspect vehicle and asked for backup to assist in stopping the vehicle.

HPD Patrol Officers Celso Bautista (Officer Bautista) and Nolan Empron (Officer Empron) responded to the call for backup and notified Officers Apilando and Morita that they were close by. Officers Bautista and Empron were each in their own subsidized police cars heading northbound. They were therefore headed toward the suspect vehicle and Officers Apilando and Morita from the opposite direction.

Officers Bautista and Empron both activated the siren and blue flashing lights on their cars, causing vehicles traveling in both the northbound and southbound direction to pull over to the side of the road. The gold Toyota Tacoma truck also pulled over. Officers Empron and Bautista were driving very slowly, about five miles per hour. Officer Bautista's car stayed in his lane, but Officer Empron straddled the center line so that he could look for the gold Toyota Tacoma truck.

Officer Morita, traveling in the same direction as the gold Toyota Tacoma truck, saw the truck pull over. Officer Morita activated his car's flashing blue light, which was on the visor, and the car's siren. Officer Morita stopped his car behind and to the left side of the gold Toyota Tacoma truck. Officer Apilando got out of the car and approached the driver's door of the gold Toyota Tacoma truck. Anthony looked at Officer Apilando who displayed his badge and yelled, "Police, get out of the vehicle." Anthony immediately turned, reversed the truck, and then drove forward, pulling out of the line of stopped traffic.

Anthony drove the truck at "an accelerated speed" toward Officers Bautista and Empron. Officer Apilando pursued

4

the truck on foot. The truck headed straight for Officer Bautista and collided with Officer Bautista's vehicle. Officer Bautista testified that it was too late to move, so he "step[ped] on [the] brake and just waited for the impact." The impact caused the airbags in Officer Bautista's car to deploy, and Officer Bautista was briefly knocked unconscious. Anthony put the truck into reverse, separated from Officer Bautista's car, then drove forward, ramming Officer Bautista's car a second time.

Anthony again put the truck into reverse. As this occurred, Officer Apilando was able to open the truck's passenger door and enter the truck. Anthony drove the truck forward and collided with Officer Bautista's car a third time. After the third collision, Officer Apilando was able to remove Anthony from the truck, and they both fell out the driver's side door. With the assistance of Officer Morita, Officer Apilando handcuffed Anthony, who struggled with the officers. After Anthony was handcuffed and allowed to sit up, he said to Officer Morita, "Sorry, but I never like get arrested." Anthony was arrested at about 12:10 or 12:12 p.m. A police report prepared in Anthony's case listed him as 5'10" and 220 pounds.

Officers Bautista, Empron, and Apilando testified that Anthony could have avoided colliding with Officer Bautista's car because there was room for Anthony to pass on the shoulder of the road next to Officer Bautista's car. HPD Officer Val Chun (Officer Chun), a traffic accident investigator, testified that he examined the Toyota Tacoma truck that Anthony had been driving and opined that the brakes and accelerator were working properly at the time of the collisions. Officer Chun found that the truck had a broken tie rod, which affected the ability to steer the truck. Officer Chun opined that the tie rod had been broken during the collisions, but was unable to say whether it broke after the first, second, or third collision with Officer Bautista's car.

The police recovered various items from the Toyota Tacoma truck. The Hutchesons identified various items found in

the Toyota Tacoma truck as their belongings, including a Louis Vuitton purse and a large red bag on the floor of the front passenger seat, identifications with social security numbers, and credit cards. Travis Abe (Abe) testified that several items found in the Toyota Tacoma truck had been taken in a theft he reported on December 11, 2007, including his electric shaver, glasses, work identification documents, receipts, pants, and other items. Brandon Tawata (Tawata) identified a backpack and its contents that were found in the Toyota Tacoma truck as items that had been stolen from him.

II.

Anthony testified in his own defense at trial. According to Anthony, on the morning of December 11, 2007, he was looking for work. Anthony rode his bicycle to Iwilei to look for construction work. He found no jobs there but a person named "Mike", with whom Anthony had previously worked, told him there might be janitorial work at a game room on King Street. Anthony and Mike went to the game room but were told that there was no work available.

While Anthony was "hanging out" at the game room, Mike introduced Anthony to a person named "Slim." Anthony had never seen Slim before and did not know Slim's last name. Anthony described Slim as a "real light-skinned" African-American with a goatee. Anthony testified that Slim offered to pay Anthony $50 to drive Slim to Waiāhole Valley to pick up a car that Slim said he had bought in that area. Anthony agreed and they left the game room and got into a gold Toyota Tacoma truck.

Slim drove to another game room, double parked, and told Anthony to "jump in the driver's seat" in case the truck had to be moved. Anthony did not notice anything unusual about the truck's locks or the truck's ignition. When Slim returned from the game room, Anthony drove to Don Quijote's where Slim went to buy food. Slim returned to the truck and told Anthony to drive to Waiāhole. On the way, they stopped at Anthony's house because Anthony wanted to get his diving equipment so he could go diving.

Anthony got his diving equipment, changed into shorts and a tank top, and put his diving gear into the truck. In the meantime, Slim got back into the driver's seat and Anthony was in the passenger seat as they headed to Waiāhole.

According to Anthony, Slim stopped at the Waiāhole Valley Store, but Slim was not able to contact the person from whom he was supposed to pick up the car. After waiting at the store for a few minutes, they proceeded on to Kualoa Beach Park. As Slim turned into the first parking lot at Kualoa Beach Park, Anthony jumped out of the truck and went down to the beach "to check out the conditions of the ocean." Slim indicated that he was going to drive the truck to the bathroom. After being down at the water for five to ten minutes, Anthony walked back to the parking lot. Anthony testified that he saw Slim "tearing out of the park." Slim did not turn back into the parking lot and went past Anthony, so Anthony had to jog over to Slim. Anthony hopped into the bed of the truck rather than the passenger seat because Slim told him, "Oh, you know what, we got to go. My friend is back at Waiahole Valley, he's waiting for us."

Anthony testified that Slim drove to the Waiāhole Valley Store. Anthony left the truck and went to urinate behind the store. When Anthony returned, Slim was taking car keys from "a big Hawaiian guy." Slim told Anthony to drive the Toyota Tacoma truck back to the game room on King Street, and Slim would meet him there. When Anthony got back in the truck, he noticed a Louis Vuitton purse and a bag on the floor near the front passenger seat that had not previously been there, but did not think anything of it.

Anthony testified that on the way back, he noticed cars on both sides of the road pulling over as police vehicles with their strobe lights and sirens on were coming towards him. Anthony also pulled over. Anthony stated that he heard a "bam" from someone striking his window and saw a guy waving and screaming at him. The man did not have anything identifying himself as a police officer that Anthony could see. Anthony

testified that his "instinct took over" and he "started to try to flee[,] to take off." Anthony "pulled out at a kind of high rate of speed" and "stomped on the gas[,]" heading southbound. As he pulled out, he saw two police cars coming towards him, one in each lane. Anthony "veer[ed] all the way left" and one of the police cars smashed into him.

Anthony saw the man who had hit Anthony's window chasing him on foot, so he put the Toyota Tacoma truck into reverse and then went forward to get away from the man. Anthony stated that he tried to turn but went straight back into the officer's car. Anthony could not explain why he was trying to get away from the man when "the police [were] right there." Anthony eventually noticed a police officer outside the truck pointing a gun at him. Anthony froze, put up his hands, and was removed from the truck.

Anthony denied knowing that the Toyota Tacoma truck was stolen and denied taking anything from the Hutchesons' rental car. Anthony admitted that he had lived in Montana during the 1990s, but denied bringing any Montana license plates with him, denied noticing that the Toyota Tacoma truck had Montana license plates, and denied seeing a Hawai'i license plate that was later found in the truck.

DISCUSSION

I.

Anthony was charged in Count 1 with first-degree criminal property damage, in violation of Hawaii Revised Statutes (HRS) § 708-820(1)(a) (Supp. 2011).[2/] Anthony did not object to the Circuit Court's instruction on the material elements for first-degree criminal property damage. On appeal, Anthony argues

---

[2/] HRS § 708-820(1)(a) provides, in relevant part, as follows:

(1) A person commits the offense of criminal property damage in the first degree if by means other than fire:

(a) The person intentionally or knowingly damages property and thereby recklessly places another person in danger of death or bodily injury[.]

that the Circuit Court committed plain error in giving that
instruction.  We disagree.

The standard of review for jury instructions is
"whether, when read and considered as a whole, the instructions
given are prejudicially insufficient, erroneous, inconsistent, or
misleading."  State v. Valentine, 93 Hawai'i 199, 204, 998 P.2d
479, 484 (2000) (citations and internal quotation marks omitted).
The Circuit Court gave the jury the following instruction on
first-degree criminal property damage:

> In count one of the indictment, the defendant, Kevin
> Anthony, is charged with the offense of criminal property
> damage in the first degree.  A person commits the offense of
> criminal property damage in the first degree if he
> intentionally or knowingly damages property and, thereby,
> recklessly places another person in danger of death or
> bodily injury.
>
> There are four material elements to the offense of
> criminal property damage in the first degree, each of which
> the prosecution must prove beyond a reasonable doubt.
>
> These four elements are[:]
>
> [O]ne, that the defendant damaged property; and
>
> [T]wo, that the defendant acted intentionally or
> knowingly as to element one; and
>
> [T]hree, that the defendant's conduct placed Celso
> Bautista in danger of death or bodily injury; and
>
> [F]our, that the defendant acted recklessly as to
> element three.

(Format changed; emphasis added.)

Anthony argues that this instruction was prejudicially
insufficient because it "failed to clearly and unequivocally
instruct the jury that the conduct that intentionally or
knowingly damaged property had to be the same conduct that
recklessly placed [Officer] Bautista in danger of death or bodily
injury."  Anthony contends that, based on the Circuit Court's
instruction, the jury could have found Anthony guilty of Count 1
if he "(1) engaged in conduct wherein he intentionally or
knowingly damaged property; and (2) engaged in separate and
distinct conduct wherein he recklessly placed [Officer] Bautista
in danger of death or bodily injury."  In support of this

hypothesis, Anthony notes that the State introduced evidence of property damage done to the lock on the Hutchesons' rental car, which was unrelated to placing Officer Bautista in danger of death or bodily injury.

We conclude that Anthony's strained and unnatural reading of the Circuit Court's instruction is without merit. When viewed and considered as a whole, the Circuit Court's instruction provided the necessary link between the defendant's conduct in damaging property and in placing another person in danger of death or bodily injury. The instruction provides that "[a] person commits the offense of criminal property damage in the first degree if he intentionally or knowingly damages property and, thereby, recklessly places another person in danger of death or bodily injury." (Emphasis added). Given this introduction and when read in context, it is clear that the defendant's conduct in damaging property required to establish element one is the same conduct of the defendant that must have placed Officer Bautista in danger of death or bodily injury in order to satisfy element three.

Moreover, the only evidence introduced by the State that Officer Bautista had been placed in danger of death or bodily injury was the evidence of Anthony's intentional ramming of Officer Bautista's vehicle with the Toyota Tacoma truck. The State did not argue that some other property damage besides the damage caused by Anthony's conduct in ramming Officer Bautista's car had placed Officer Bautista in danger of death or bodily injury. Under these circumstances, we conclude that the Circuit Court's instruction on the elements for first-degree criminal property damage was not prejudicially insufficient, erroneous, inconsistent, or misleading.

II.

Anthony contends that the Circuit Court committed plain error by failing to give the jury a specific unanimity instruction as to the offenses of first-degree criminal property damage (Count 1), first-degree assault against a law enforcement

officer (Count 6), and first-degree terroristic threatening (Count 7). We disagree.

Anthony notes that the State presented evidence that Anthony drove the Toyota Tacoma truck and engaged in three separate and distinct collisions with Officer Bautista's car. Anthony argues that because the Circuit Court did not give the jury a specific unanimity instruction, "the jury may not have unanimously agreed as to which of these three acts provided the basis for finding Anthony guilty of Count 1." Anthony further argues that because these acts also provided the basis for Counts 6 and 7, "the jury may not have unanimously agreed as to the basis for convict[ing] Anthony of those offenses." In support of his argument, Anthony cites State v. Arceo, 84 Hawaiʻi 1, 928 P.2d 843 (1996). We conclude that Arceo is inapposite.

In the absence of an election by the prosecution, two conditions must converge before an Arceo specific unanimity instruction is necessary: "(1) at trial, the prosecution adduces proof of two or more separate and distinct culpable acts; and (2) the prosecution seeks to submit to the jury that only one offense was committed." Valentine, 93 Hawaiʻi at 208, 998 P.2d at 488. Therefore, an Arceo specific unanimity instruction "is not required if the conduct element of an offense is proved by the prosecution to have been a series of acts constituting a continuous course of conduct and the offense is statutorily defined in such a manner as to not preclude it from being a 'continuous offense.'" State v. Rapoza, 95 Hawaiʻi 321, 329-30, 22 P.3d 968, 976-77 (2001); see also Valentine, 93 Hawaiʻi at 208-09, 998 P.2d at 488-89 (concluding that a specific unanimity instruction was not required where the charge was based on "a single incident of culpable conduct").

Here, the State presented evidence at trial that Anthony's three collisions with Officer Bautista's car was part of a series of acts constituting a continuous course of conduct. In addition, the offenses charged in Counts 1, 6, and 7 are not statutorily defined in such a manner as to preclude them from

11

being continuous offenses. Accordingly, no specific unanimity instruction was required. See Valentine, 93 Hawai'i at 202, 208-09, 998 P.2d at 482, 488-89 (holding that a specific unanimity instruction was not required regarding a charge of attempted prohibited possession of a firearm because the defendant's acts of (1) reaching for, (2) clasping of, and (3) tugging on a police officer's firearm constituted a "single episode"); State v. Rapoza, 95 Hawai'i at 329-30, 22 P.3d at 976-77 (holding that a specific unanimity instruction was not required because multiple discharges of a firearm in the direction of the three complainants was a single continuous offense as to each complainant).

We also note that there was overwhelming evidence that Anthony intentionally and knowingly drove the Toyota Tacoma truck into Officer Bautista's car with respect to each of the three collisions. We conclude that there is no reasonable possibility that a juror might have found that Anthony intentionally and knowingly drove the Toyota Tacoma truck into Officer Bautista's car for one collision but not the other two. Therefore, even assuming arguendo that a specific unanimity instruction was required, the failure to give such an instruction was harmless error.

III.

Anthony argues that the Circuit Court erred in permitting Abe and Tawata to testify that their property, which had been taken in uncharged thefts, was later found in the Toyota Tacoma truck that Anthony was driving. We conclude that the Circuit Court erred in admitting this evidence, but that such error was harmless beyond a reasonable doubt.

The admissibility of evidence requires different standards of review depending on the particular rule of evidence at issue. State v. Duncan, 101 Hawai'i 269, 273-74, 67 P.3d 768, 772-73 (2003). "With respect to [Hawaii Rules of Evidence (HRE)] Rule 403, 'which requires a 'judgment call' on the part of the trial court,' the appropriate standard of review on appeal is

12

abuse of discretion." Id. at 274, 57 P.3d at 773 (brackets and citation omitted).

Abe testified that he was notified by the police that some of his belongings had been found in the Toyota Tacoma truck that Anthony had been driving. Abe was shown pictures of items recovered from the Toyota Tacoma truck and identified various items as his property, including an electric shaver, glasses, work identification documents, receipts, and pants. Abe explained that these items had been stolen from his truck and that he had reported the thefts on December 11, 2007. Abe testified that he did not know anyone named "Kevin Anthony" or "Slim." The State introduced into evidence photographs of the items found in the Toyota Tacoma truck that Abe identified as belonging to him. While Abe was testifying, Anthony did not object to Abe's testimony or the introduction of the photographs.

However, after Abe completed his testimony, Anthony moved to strike Abe's testimony on the ground that it was irrelevant. Anthony acknowledged that he had previously agreed to the admission of the photographs, but stated that he now realized that Abe's testimony was irrelevant because the charges against Anthony did not include any complaint by Abe. The State argued that Abe's testimony was relevant because: (1) the presence of other people's possessions, including identifications, in the Toyota Tacoma truck would tend to refute Anthony's defense that he did not know the truck had been stolen; and (2) the testimony would eliminate Abe as a person who stole the truck. The Circuit Court overruled Anthony's objection and allowed Abe's testimony to stand.

The State later called Tawata to testify. Before Tawata testified, Anthony objected on the ground of relevance, which the Circuit Court overruled. Tawata testified that sometime prior to December 11, 2007, his backpack had been stolen from his vehicle. Tawata identified his stolen backpack and its contents in photographs he was shown of items recovered from the

Toyota Tacoma truck. Tawata testified that he did not know anyone named "Kevin Anthony" or "Slim."

On appeal, the State argues that the testimony of Abe and Tawata was relevant to refute Anthony's claim that he honestly believed that "Slim" was the owner of the Toyota Tacoma truck and had given Anthony valid authorization to drive the truck. The State asserts that Abe's and Tawata's testimony "was relevant to show that, if [Anthony] had seen and investigated Abe and Tawata's property, he would have been alerted to the fact that Slim, who purportedly gave permission to Defendant to operate the truck, was not authorized to permit Defendant to operate the truck[.]"

Evidence that other people's belongings were in the Toyota Tacoma truck, especially Abe's identification documents, may have been relevant to refute Anthony's defense if these items were in plain view and would reasonably have alerted Anthony that the truck had been stolen. However, the State did not introduce evidence that Abe's identification documents were in plain view. The State also did not present evidence that, or otherwise explain how, the other personal items identified by Abe and Tawata would have served to reasonably alert someone that the truck had been stolen. Under these circumstances, we conclude that the minimal probative value of the evidence was substantially outweighed by the danger of unfair prejudice flowing from Abe's and Tawata's testimony regarding uncharged thefts, see HRE Rule 403 (1993), and that the Circuit Court erred in admitting testimony of the uncharged thefts.[3/]

We conclude, however, that the Circuit Court's error in admitting such testimony was harmless beyond a reasonable doubt. With respect to Count 1 (first-degree criminal property damage), Count 6 (first-degree assault against a law enforcement officer),

---

[3/] Under the circumstances of this case, the State's contention that Abe's and Tawata's testimony was relevant and admissible to show that they had not stolen the truck or authorized Anthony to drive it is without merit.

and Count 7 (first-degree terroristic threatening), which all arose out of Anthony's repeated ramming of Officer Bautista's car, the evidence against Anthony was overwhelming.  Anthony admitted that he initially pulled over in response to hearing the police sirens and seeing the blue strobe lights emanating from the cars of Officers Empron and Bautista.  In addition, after Anthony had pulled over, Officer Morita activated his visor strobe light and siren and pulled up behind the Toyota Tacoma truck.

Officers Morita and Apilando both testified that despite Officer Apilando identifying himself as "police" and displaying his badge, Anthony attempted to flee.  Anthony pulled away at a high rate of speed and drove straight into Officer Bautista's car, which Anthony knew was a police vehicle.  Anthony then reversed, rammed into Officer Bautista's car a second time, reversed again, and rammed into Officer Bautista's car a third time before he was finally subdued.  Although Anthony claimed that he was trying to get away from the guy chasing him on foot, he could not explain why he had to engage in such extreme measures to elude this person when he knew the police were right there.  After being arrested, Anthony apologized and said to Officer Morita, "Sorry, but I never like get arrested."

The Circuit Court's error in admitting Abe and Tawata's testimony regarding the uncharged thefts was clearly harmless beyond a reasonable doubt as to Counts 1, 6, and 7.  We also conclude that the error was harmless beyond a reasonable doubt as to Counts 2, 3, 4, and 5, which related to Anthony's unauthorized control of the Toyota Tacoma truck and the break-in and theft from the Hutchesons' car.  The State presented compelling evidence regarding Anthony's guilt on these counts.  There was undisputed evidence that the Toyota Tacoma truck had been stolen; that a single individual driving the Toyota Tacoma truck had broken into the Hutchesons' car and stolen their possessions; and that a short time after the break-in, Anthony was driving the Toyota Tacoma truck as its sole occupant, with items stolen from

the Hutchesons in plain view on the front passenger side of the truck. There was also overwhelming evidence that Anthony engaged in extreme measures, including ramming a police car three times, in an attempt to flee from the police, which demonstrated his consciousness of guilt with respect to his operation of the Toyota Tacoma truck, his possession of the truck's contents, and his prior conduct.

Anthony's defense in the face of this compelling evidence was that a person named "Slim," whom Anthony had never met before and whose last name he did not know, had given Anthony authorization to drive the Toyota Tacoma truck and was solely responsible for the theft from the Hutchesons' car and the other stolen items found in the truck. The State presented strong evidence refuting Anthony's defense. Contrary to Anthony's version, Samuel Hutcheson testified that he did not see the Toyota Tacoma truck, which "pealed out" of the parking lot, stop to pick anyone up. The short time frame from the HPD dispatch call to when Anthony was spotted driving the Toyota Tacoma truck also serves to contradict Anthony's claim that "Slim" stopped at the Waiāhole Valley Store and that Anthony went behind the store to urinate before getting into the truck and heading back to the game room on King Street. Moreover, Anthony could not explain why he did not think anything of the presence of the Hutchesons' Louis Vuitton purse and large red bag on the front passenger side of the truck, especially since according to his version, those items were not previously in the truck. He also did not explain why "Slim," a person whom he had never met before, would choose to break into a car and steal items while Anthony was along for the ride.

In addition, Anthony's defense served to mitigate and minimize the risk of prejudice from Abe's and Tawata's testimony with respect to Counts 2, 3, 4, and 5. Abe's and Tawata's testimony was consistent with Anthony's defense that "Slim" had been in possession of the Toyota Tacoma truck and was responsible for the stolen items found in the truck. Considering all the

evidence presented, we conclude that there is no reasonable possibility that the error in admitting Abe's and Tawata's testimony might have contributed to the jury's guilty verdicts on any of the counts.

CONCLUSION

For the foregoing reasons, we affirm the Judgment of the Circuit Court.

DATED:  Honolulu, Hawai'i, February 17, 2012.


On the briefs:

Craig W. Jerome
Deputy Public Defender
for Defendant-Appellant

Brian R. Vincent
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee

Chief Judge

Associate Judge

Associate Judge

17